IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 19, 2022

## JAMES FRANKLIN BYRD v. VALERIE FINLEY BYRD v. BYRD BROTHERS, LLC, ET AL.

**Appeal from the Circuit Court for Shelby County
No. CT-003838-16  Robert Samual Weiss, Judge**

_____

**No. W2021-00926-COA-R3-CV**

_____

This is an appeal following a four-day divorce trial.  The husband raises nine issues on appeal regarding the grounds for divorce, the role and testimony of an expert witness, the valuation and division of marital property, judgments for attorney fees and accountant fees, and a finding of criminal contempt.  For the following reasons, we affirm as modified and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Bruce S. Kramer, Memphis, Tennessee, for the appellant, James Franklin Byrd.

Nick Rice and Jessica Farmer Ferrante, Memphis, Tennessee, for the appellee, Valerie Finley Byrd.

### OPINION

### I.   FACTS & PROCEDURAL HISTORY

James Franklin Byrd ("Husband") and Valerie Finley Byrd ("Wife") married in 1982, when both parties were in their twenties.  They had three daughters, including twins, during the marriage.  Wife was a stay-at-home mother for most of the marriage, while Husband owned and operated McDonald's franchises in and around Memphis.  The parties resided in a home in Collierville and enjoyed what the trial court described as "a relatively high standard of living."  They also owned a second home in Memphis, where Husband's

sister resided rent-free. As their three children reached the age of majority, Husband and Wife continued to pay expenses for them while they attended college and received advanced degrees.

On September 20, 2016, after thirty-four years of marriage, Husband filed a complaint for divorce asserting irreconcilable differences and requesting that the court divide the parties' marital estate. Wife filed an answer and counter-complaint for divorce, in which she admitted that irreconcilable differences had arisen but also alleged that grounds for divorce existed due to Husband's inappropriate marital conduct and adultery. She also sought a division of the marital estate, in addition to temporary and permanent alimony and attorney fees. Husband filed an answer denying that he committed adultery or engaged in inappropriate marital conduct.

Almost immediately, Wife and her attorneys encountered difficulty in obtaining information from Husband through discovery. Just a few weeks into the proceeding, Wife filed a motion to compel discovery responses. She asserted that Husband had been an entrepreneur who operated McDonald's restaurants while she was a homemaker with limited access to financial information about the parties' sizeable estate. Wife claimed that Husband had entered into a business venture with someone in Dubai involving a bank in Switzerland and that she needed information regarding Husband's bank accounts. She also claimed that the parties' adjusted gross income on their 2014 tax return was over $3.5 million, but since the divorce was filed, Husband had asked her to sign a tax return for 2015 reflecting income of only $18,000. Thus, she claimed that Husband was engaging in concerning behavior, that he controlled "much of the information needed to resolve this divorce," and that he would not respond to her requests for discovery. After a hearing, the trial court granted the motion to compel. Husband was ordered to respond to the discovery by a certain date and required to execute a release Wife had requested so that she could obtain information from his accountant in Pennsylvania.

On July 21 and July 25, 2017, a hearing was held before a divorce referee regarding pendente lite support. Prior to the hearing, Husband and Wife both submitted statements of their monthly expenses and income. Husband listed a monthly "net income" of $17,059.79, which, he said, "includes draws from and personal expenses paid by two McDonald's Restaurants." He also listed exactly $17,059.79 in monthly expenses. Specifically, he listed over thirty general categories of expenses that his McDonald's restaurants were paying on his behalf, ranging from his house note to haircuts. Wife's statement showed that she received $2,247 per month in "salary" from the McDonald's restaurants, and she listed monthly expenses of $8,925.60. As a result, she listed a monthly "shortfall" of $6,678.60. Notably, however, she also included on her expense statement as an "Additional need" that she had "Expenses for Robert Vance, CPA, ABV, CFF, CVA, CFP."

At the beginning of the pendente lite hearing, Wife's counsel explained that

Husband still had only produced very limited information in his discovery responses, simply stating that he owns two McDonald's restaurants. Counsel stated that Wife and her attorneys had independently "unearth[ed]" a wealth of information regarding additional business interests and undisclosed bank accounts through their own investigation, by issuing subpoenas and tracing accounts. Counsel explained that these efforts had greatly increased the attorney fees Wife had incurred thus far and that she was seeking an award of such fees. Given the "complexity of the business dealings," counsel further argued that "we need as part of our attorney's fees the money to hire Mr. Rob Vance, . . . forensic CPA, to be able to make sense of this." Counsel explained that he did not know how to evaluate and condense the information "as far as the breadth of money that's been concealed by Mr. Byrd," so he intended to show "why we need Mr. Vance to come in and why Mr. Byrd should be required to pay that." Thus, he said that Wife was asking for "all of our attorney's fees to date" in addition to $30,000 needed for Mr. Vance, with Husband either paying that amount up front or through ongoing billing. In response, Husband's counsel admitted that Husband had "always controlled the money." He said that "[Husband] or the restaurants literally pays for everything including student loans for their daughters, a car for their daughters and every one of the $17,000 a month expenses that are listed which include health insurance for [Wife], life insurance for [Wife], car insurance, car lease, everything." However, he claimed that Husband intended to continue paying those and that an additional award of support was not necessary.

The divorce referee heard testimony from Wife and Husband over the course of two days. Wife, who was sixty years old, testified that she had only recently discovered that Husband had other businesses, with money "coming in and out and we don't know where it's coming and going." She explained that Husband listed only two businesses in his discovery responses but that she had found "about six different companies" by examining statements. Likewise, she said that Husband had identified only four bank accounts but that she and her attorneys had "found over 17 different accounts." She testified that "there was about $17 million going through" the accounts. Wife testified that she and her attorneys had spent hours going through bank statements, and even though they hired a certified public accountant, he had been unable to identify the extent of information hidden by Husband. She testified that she had incurred attorney fees of nearly $25,000 solely in relation to collecting and analyzing the information regarding Husband's income. As a result, she said, "I am asking the Court that we hire a forensic CPA which is an expert in going through expenses and statements to find what is hidden." At that point, the divorce referee informed counsel that it would be more appropriate to address this request to the trial judge, so counsel said he would "skip over the rest of the testimony about Mr. Vance's cost." Wife testified that Husband had traveled to Jamaica and New Orleans since he filed the complaint for divorce. He had also spent about $10,000 annually on his mother and another $15,000 on women's clothing, which was not for Wife. At the same time, however, Wife testified that Husband refused to pay for her hospital bills and prescriptions and that she had been borrowing money from their daughters and her sister.

At the outset of Husband's testimony, he acknowledged that his discovery responses only disclosed business interests in two McDonald's restaurants. Wife's counsel then asked Husband whether he "retain[ed] an interest in more businesses than you disclose in this document," and Husband testified that he did not. Husband was then shown records from the Tennessee Secretary of State listing him as the principal officer of several other business entities. Husband testified that he had "set these companies up administratively" for McDonald's franchises operated by his brother but that he never "owned" any interest in them, even though he was also listed on related bank accounts and shared office space with his brother. Another company, Husband claimed, was just "a name" with "no assets" and "nothing behind it." Another, he claimed, was related to franchises he had sold in 2014.

A similar exchange occurred regarding bank accounts. Husband acknowledged that he had identified only five bank accounts in his discovery responses. Wife's counsel asked if "you have more bank accounts than you disclosed in this document," and Husband responded, "I do not." When presented with bank statements bearing his name, however, Husband admitted that his name was listed on about a dozen additional bank accounts at various banks. He acknowledged that the bank statements showed that three of the business interests brought in $7.2 million in 2016. He admitted that the records also showed transfers totaling over $250,000 to a certain female, whom he identified as his business partner's girlfriend. He claimed that these payments were related to a business venture in which they had tried to set up a salvage operation in Nigeria. Husband said he and his brother had recently traveled to Nigeria to meet with a king there about their idea. Wife's counsel asked, "Are you going to be the only person in history to actually make money when dealing with a Nigerian royalty?" Husband responded, "It doesn't look like it." He also acknowledged entering into a joint venture agreement with someone in Dubai and trying to broker oil from Saudi Arabia.

Husband testified that he had owned three additional McDonald's franchises over the course of the marriage, but he said that they were sold for "a total loss." When questioned by Wife's counsel, however, he was presented with bills of sale and related documents for two of the franchises sold in 2014 and conceded that one sale showed a "net to seller" of $1.4 million and the second sale showed a "net to seller" of over $800,000. Still, Husband claimed that he had been forced to sell those two franchises by McDonald's Corporation because he had too much debt and that he never realized any money once he paid the debts he owed. Husband acknowledged that the parties' 2014 tax return showed over $3.5 million in total income, but he said that most of that sum was due to gains from the sales of the franchises. He claimed to have numerous outstanding debts, including one to the IRS from 2014. In short, Husband claimed that he could not afford the expenses he had been paying since the divorce proceeding began and that he had to "borrow money and borrow money and borrow money" to meet his obligations. However, he admitted that he had not produced any documentary proof of the debts he listed in his discovery responses, aside from his testimony about them. Husband also conceded that even though his

- 4 -

restaurants were paying $17,000 per month in "personal expenses" for him, his income tax return stated that he had received "far less than that." He agreed that his 2015 tax return showed that he made only $18,000 that year.

After the pendente lite hearing before the referee, an order was entered directing Husband to pay Wife temporary alimony in the sum of $5,000 per month, and he would remain responsible for paying specified bills. The order also stated that Wife had expended financial resources and litigation costs in preparation for the hearing in order to obtain the financial information that Husband had failed to disclose, so Husband was ordered to pay Wife $10,000 in attorney fees and $10,000 in litigation costs. After an appeal of the referee's decision, the trial judge reviewed the record of the pendente lite hearing and reduced the temporary alimony payment to $3,000 per month, considering that Husband was also paying all of the bills, but the court found the remainder of the order appropriate.

Wife filed a "Motion to Appoint Rob Vance as Forensic Accountant and to Hold Husband Responsible for the Fees Incurred." The motion did not cite any legal authority for the request. Instead, it detailed Wife's efforts to obtain information from Husband through discovery and his repeated failures to comply. She noted that the trial court had entered an order granting her motion to compel discovery responses in November 2016 but stated that Husband did not respond until weeks after the court's deadline, and even then, his responses were inadequate. Wife described her efforts to subpoena information directly from financial institutions in order to gather Husband's financial records herself. She described the information that she and her attorney were able to discover independently, which revealed that Husband was in fact concealing information, including seven undisclosed business entities and thirteen additional bank accounts. She noted that over $17 million was moved in and out of those entities and accounts in 2016 alone. She also noted that Husband's tax returns were unreliable, showing only $18,000 in income in 2015 while he admitted his restaurants paid $17,000 per month in personal expenses for him. Wife said that it would be extremely difficult if not impossible for her attorney to determine what else Husband was concealing without having specialized training. She claimed that if her attorney was forced to continue discovering information by way of costly subpoenas and time-consuming means, she would incur "astronomical attorney's fees." Accordingly, she argued that "an expert forensic accountant is necessary to keep costs down." Wife stated that Rob Vance was a highly qualified forensic accountant and that he had already performed a cursory review of the documents and found that Husband concealed information. She submitted an affidavit of Mr. Vance, which stated that he had found "a magnitude of information which was concealed by [Husband]." He said that the collected information thus far showed sixteen bank accounts "with millions of dollars being transferred in from unknown sources and millions transferred out to unknown destinations." He also said that Husband's tax returns did not "parallel the volume of transactions evidenced in the sixteen bank accounts." Mr. Vance predicted that it would cost about $30,000 for him "to review, trace, begin to make sense of, and provide an opinion to aide this Honorable Court." However, Wife's motion stated that this amount

paled in comparison to the amount she would incur in attorney fees without Mr. Vance and that she desired to preserve the marital estate. Wife's motion pointed out that the order on pendente lite support had already found that she was the economically disadvantaged spouse, and Husband was making eight to ten times more income and voluntarily supporting his sister, mother, and adult daughters. Wife further argued that Husband had the "ability to pay" the fees of Mr. Vance, and that they were necessary due to his own deceitful actions. Mr. Vance also submitted an affidavit in his capacity as "Custodian of Records for Forensic & Valuation Services, PLC."

After a hearing, the trial court granted Wife's motion regarding Mr. Vance. The order states that there was "a need for a forensic accountant to determine Husband's business dealings and values, assets and values, and Husband's income." Thus, Mr. Vance was "appointed as a forensic accountant" to value Husband's business interests and identify his income. Husband was ordered to immediately pay Mr. Vance $15,000, and if Mr. Vance's fees exceeded that sum, the additional fees incurred would be addressed at trial. Husband and his counsel were ordered to cooperate with Mr. Vance's investigation and provide all information requested by Mr. Vance in a timely manner.

Thereafter, Wife filed an amended counter-complaint for divorce, adding about nineteen entities, in which Husband allegedly had an interest, as counter-defendants. She alleged that the various entities were formed during the marriage and held money and assets that were marital in nature and subject to equitable division. Wife also filed a petition for civil contempt around this time, alleging that Husband failed to comply with the court's orders to pay the temporary alimony, specified bills, attorney fee award, and the fee to Mr. Vance. At a hearing on the petition for contempt, Husband claimed that he was "just poor" and unable to pay everything. However, Wife's counsel argued that Husband still had not provided any of the documents Mr. Vance needed to determine his income. Ultimately, the trial judge found that the vast majority of the documents had been obtained as the result of subpoenas at huge expense. He warned Husband that "the games have to stop" and said that it was ridiculous for Wife's counsel to continue "turning over rocks" to find information when Husband could simply produce it himself. The trial judge found it "absolutely baffling" that Husband could manage multiple businesses but could not produce documents in a timely manner. He stated that he was "really just at a loss" and that he could not find any of the testimony from Husband credible. In the written order entered after the hearing, the trial judge entered a judgment against Husband for $51,340.66, representing the amounts he owed for unpaid temporary alimony, bills, attorney fees, and Mr. Vance's fee. The trial court found that Husband still had not complied with discovery requests as required by its order on the motion to compel or produced information as required by the order addressing Mr. Vance. The court found that these violations were willful, that Husband was capable of complying and producing the information, and that Wife continued to incur additional attorney fees due to Husband's noncompliance. Thus, Husband was found in civil contempt for his failure to produce information previously ordered by the court, and he was sentenced to incarceration every

weekend until he purged himself of contempt by producing the information. The trial court awarded Wife an additional award of $24,244 in attorney fees.

About a month later, Wife filed another petition for civil contempt, alleging that Husband still had not produced the required information and that she had discovered even more undisclosed accounts and business interests. After an additional hearing, the trial court entered an order directing Wife's counsel to prepare a deficiency list showing exactly what documents were missing. Husband was ordered to produce the information by April 5, 2018, and a hearing was set for April 6 to address the matter. Wife then filed another petition for contempt on April 6 regarding additional unpaid obligations.

At the April 6 hearing, the trial court found that Wife had produced the deficiency list and that Husband had failed to produce all of the necessary items despite numerous continuances. Thus, on April 20, 2018, the court entered an "Order on Document Due Date and Sanctions Pursuant to Amended Petition for Civil Contempt." The order stated that Husband was found in contempt pursuant to Tennessee Rule of Civil Procedure 37.02 for repeatedly failing to comply with orders regarding discovery, and as a result, he would be precluded from presenting any documents at trial that he had not produced as of the date of the contempt hearing -- April 6, 2018. The trial court ordered Husband to produce certain additional information by a certain date, and if those items were not produced by then, "as an additional sanction," his original complaint for divorce and answer to Wife's counter-complaint would be stricken, the case would proceed "on a default basis" based on the counter-complaint, and Husband would be precluded from putting on any defense or proof against Wife's allegations. A "Consent Order on Second Petition for Civil Contempt" was also entered regarding Husband's unpaid obligations. It stated that Husband had not paid various items and that Wife was awarded an additional judgment of $11,943.88 for temporary alimony, bills Husband was ordered to pay, and Wife's unpaid salary from McDonald's.

On July 31, 2018, a dispute arose during Husband's deposition, which led to the immediate filing of an emergency petition for an injunction and a hearing that same day, before another trial judge. The emergency petition alleged that Husband had used his cell phone and iPad for activities relating to dissipation and undisclosed business interests and that it was believed to contain information concerning such activity. The petition cited Husband's history of concealment and alleged that he would destroy or hide the evidence on his devices unless he was enjoined from doing so. The petition sought an injunction prohibiting Husband from destroying, deleting, or erasing files from any device and requiring him to deliver his phone and iPad to a forensic examiner acting on behalf of Wife for copying during his deposition. During the hearing, Wife's counsel informed the judge that the parties were in the midst of Husband's deposition earlier that day when the dispute over the phone arose, and when Wife's counsel announced that they were going to file the emergency petition in court, Husband "took off" to the parking garage with his phone. Husband's counsel did not know the whereabouts of his client. The judge announced that

she would order Husband to turn over his phone to the forensic examiner immediately without destroying any files. She said the copy of the phone would be placed under seal with the court until Husband could file objections. She signed the fiat issuing the injunction prayed for in the petition, enjoining Husband and any person acting on his behalf from destroying, deleting, or erasing files from any device and directing him to immediately deliver his phone and iPad to the forensic examiner for copying during his deposition.

Two weeks later, Wife filed yet another petition for civil contempt and injunction. She claimed that Husband had refused to return to his deposition and immediately turn over his phone as ordered and suggested that he may have deleted files when he ran from the courthouse. Thus, Wife sought an additional injunction allowing her and the forensic examiner to access the office space of Husband and his various business entities to copy additional devices there. After a hearing, the trial judge signed a fiat requiring Husband to produce his cell phone and iPad as previously ordered and allowing Wife's agents to access the office and copy the computers and devices. Notably, the fiat, signed on August 13, 2018, specifically stated that Husband and his agents were prohibited from destroying, deleting, or erasing any files or documents from the devices.

A few months later, Wife filed a petition for criminal contempt. She alleged that despite the existence of the mandatory mutual injunctions and the trial court's various orders prohibiting the deletion of files, Husband had willfully destroyed or allowed the destruction of over 175,000 files from his laptop, containing eighteen gigabytes of data, on or about August 14, 2018. Wife also filed another petition for civil contempt and renewed her request for a finding of contempt due to the funds owed by Husband. The parties agreed that the remaining contempt issues would be addressed at trial.

In the weeks before the upcoming trial date, Husband filed a motion to continue, claiming that Wife had recently identified three experts that she intended to call at trial and that Husband needed time to depose them. One of those experts was Mike Pascal, an associate of Robert Vance. The trial court granted Husband's request for a continuance. Husband later requested another continuance on the basis that his own "valuation expert" was not available on a certain date. At a hearing, Wife's counsel argued that Husband should not be permitted to put on any proof due to his failure to comply with the court's previous orders and the resulting order containing sanctions. Counsel pointed out that the court's April 20, 2018 order on sanctions concluded by stating that if Husband failed to produce specified information by a certain deadline, an "additional sanction" would be imposed whereby Husband's complaint and answer would be stricken, the matter would proceed on a default basis, and Husband would be precluded from putting on any proof or defense. After some further discussion about the sanctions imposed, the trial court entered a written order addressing the issues, entitled, "Order on Scope of Proof at Trial." First, the order addressed Husband's request for another continuance so that he could call an expert at trial. The trial court denied this request due to "hardship" to Wife. The court noted that Husband had been "difficult and uncooperative" throughout discovery and that

he did not comply with the order on sanctions by responding to discovery. Furthermore, the court noted that Husband disclosed the expert less than one month before the trial date. The court then explained that it would enforce the sanctions set forth in its previous order with a few modifications: Husband would be permitted to put on proof at trial if it was produced to Wife prior to April 20, 2018 (the date of the previous sanctions order); he could not use documents obtained by Wife's independent investigation thereafter; he could only call fact witnesses if they were disclosed prior to April 20, 2018; and he could not call any expert witnesses as none had been disclosed. The order stated that "Wife's experts may testify." It also stated, "Husband stipulates that Wife is entitled to a divorce."

That same day, the court also entered a "Stipulation and Consent Order on Matters for Trial," which stated:

> The following are expert witnesses in this case, and no voir dire is required of any of them at trial:
> a. Ted Scott
> b. Mike Pascal
> c. Rob Vance; and
> d. Grant Sperry

The consent order also stated that Wife's attorney fees were reasonable and necessary.

The divorce trial was held over the course of four days in October 2019. At the beginning of trial, the judge and the attorneys briefly discussed the issue of grounds for divorce. The following exchange occurred:

> [Wife's counsel]: Quickly on grounds, we've got a – [Husband's counsel] said the last time we were in court that he would stipulate to the grounds, but the grounds that we pled were inappropriate marital conduct and adultery.
>     We can't get a stipulation on the adultery, and we're going to put on very limited proof because [Husband] has admitted to multiple affairs with at least a few women. Because they want him to be 100 percent at fault because of demise in the alimony award.
>
> THE COURT: Well, again, if everyone stipulates that he's guilty of inappropriate marital conduct, then I don't know that I need to hear, you know –
>
> [Husband's counsel]: The way the statute is written is all you have to do is just stipulate to grounds pursuant to 36129 [sic]. That's all you have to do.
>
> [Wife's counsel]: As long as he's 100 percent at fault.

THE COURT:  That's fine.

[Wife's counsel]:  Okay.  Then we can move past that.

The parties went on to present proof regarding the issues of marital property, alimony, attorney fees, and contempt.

Wife testified on the first day of trial.  She explained that the parties did not discuss their finances much during the marriage, and she described Husband's steadfast refusal to be forthcoming with information throughout the divorce proceeding.  As a result, Wife believed that the best evidence regarding the extent of the parties' marital estate was a financial statement she had discovered that was signed by Husband the previous year, on January 25, 2018.  She testified that Husband had eventually admitted to compiling and signing the financial statement.  On that financial statement, Wife explained, Husband had listed the parties' total net worth at $4,759,872.33.  Wife said she had no reason to disagree with the figures he included.  However, she and her attorney had made some edits to that figure to include additional information they had gathered regarding undisclosed assets and debts.  Wife said that she had to hire experts to find some of the additional information.  Combining the additional information with that provided on the financial statement, Wife calculated the total marital estate at $5,000,895.54, and she asked the court to distribute half of that figure to her.  She acknowledged that she was not able to assign a value to some of the assets but said the process had simply become too costly and that she did not want to drag out the divorce proceeding any longer.  She sought an award of attorney fees and also asked the court to hold Husband in contempt.

The first expert witness Wife called was Mike Pascal, a certified valuation specialist from Forensic Valuation Services, PLC.  Husband's counsel stated, "We've already stipulated before we got here that he's an expert.  No need to voir dire him."  Mr. Pascal then explained that he was employed by the company owned by Mr. Vance, and he identified the order the trial court had entered regarding Mr. Vance.  At that point, Husband's counsel objected to any further testimony from Mr. Pascal.  He argued that the trial court had "appointed" only Mr. Vance, not his associates. Wife's counsel questioned how Husband's counsel was objecting to Mr. Pascal given that he had already stipulated prior to trial that he was an expert.  The trial judge then overruled the objection to Mr. Pascal's testimony.  Mr. Pascal went on to testify that he works for Mr. Vance and that they perform work together "as the firm."  He said that the firm enters into engagements and that they issue opinions and reports "as the firm."  Thus, Mr. Pascal testified that he and Mr. Vance had worked together on this case, just as they do in all cases.  When asked why he was testifying rather than Mr. Vance, Mr. Pascal explained that he was the primary analyst on this case, his compensation rate was less than Mr. Vance's rate, and Husband had still not paid everything owed to date.

Mr. Pascal testified that Husband did not comply with the portion of the trial court's

- 10 -

order directing him to cooperate with the investigation of his businesses and income. He explained, "Information we received was only half the information at times. Half the time periods we had trouble. We even had trouble reading some of the information. It was not legible. It was non-responsive. It was outdated." Mr. Pascal said that there were numerous deficiency lists prepared and sent to Wife's counsel, which were then forwarded to Husband's counsel. He said that Husband never turned over any books for the companies that were in a normal, legible, or useful condition. He said they did get some tax returns and compilation statements from Husband's accountant, but only "[t]hrough 2015." Even for those, however, he noted that the tax returns did not include the personal expenses being paid by Husband's various businesses. Mr. Pascal said that payments of personal expenses are typically seen in a company's records as a loan to a shareholder or a distribution or draw, but he did not see any such records in the information he was provided, nor did he see anything else to indicate that the payments should not have been reported as income. Thus, he opined that Husband's income tax returns were not consistent with the amount of income he was able to trace to Husband. Mr. Pascal acknowledged that $17,000 per month in personal expenses would, standing alone, equate to an income of over $200,000 annually. However, he testified that Husband's personal expenses were also being paid by other businesses. In sum, Mr. Pascal said that due to the lack of information he received, he was unable to definitively identify Husband's income, but the "bare minimum" would be $17,000 per month.

Mr. Pascal also testified about how the financial statement was discovered. He clarified that Husband had never provided the financial statement to Mr. Vance's office or to Wife's counsel. Instead, he said a bank had produced the financial statement, amongst other documents, in response to a subpoena. Mr. Pascal testified that Husband eventually responded to requests for admissions and admitted that he created the financial statement.

On the financial statement, Husband had valued his two McDonald's restaurants at a combined value of $4,099,281.72. Mr. Pascal testified that his firm had previous experience valuing McDonald's restaurants and had valued approximately 65 McDonald's franchises in the past two years, with all of those being located in the Memphis and Mid-South area. For this particular valuation, Mr. Pascal testified that he looked at all three of the main approaches to valuation, including the market approach, the income approach, and the asset approach. Ultimately, Mr. Pascal found it appropriate to utilize a market-based approach for the McDonald's franchises at issue, and more specifically, the "guideline transactions method." He concluded that the asset approach was not appropriate because it is usually used for other types of companies. He also said that he encountered difficulty in applying an income approach to Husband's franchises due to the fact that he ran an extreme amount of personal expenses through the stores, which would require identification of the expenses and adding them back. Mr. Pascal said he never got a list of all the personal expenses Husband was running through the stores and that one cannot determine the real operating income or real cash flow of a store under those circumstances. He also said he was unable to verify the expenses listed on Husband's income and expense

statement and declined to simply accept them "at face value."

The approach he chose, the guideline transaction method, took data from comparable stores into consideration in order to ascertain the value of Husband's stores. It also took Husband's expenses "out of the equation." Mr. Pascal explained that, based on his past experience with other McDonald's franchises, he was aware of the proprietary method that McDonald's Corporation and its franchise operators used to value individual franchises. This formula took into account the store's cash flow, interest expense, an allowance for general and administrative expenses, a multiplier, and long-term liabilities. Mr. Pascal said he applied the same formula used by McDonald's Corporation and supplied information either from Husband's reported financial information or comparable Mid-South stores. For instance, he said that he did not have any current financial information from Husband for the current cash flow of his McDonald's stores, so he took the information from the database of 65 stores and determined how much revenue those stores had over the past three years in order to calculate a revenue multiplier. He considered the numbers from the two McDonald's franchises Husband had sold in 2014 and compared them to the average database revenue multiplier. In addition, he used some 2015 figures but added an adjustment or growth factor to reach a reasonable value as of the time of trial of $4,011,000. Based on his overall investigation and gross revenue analysis, Mr. Pascal believed that the value of $4,099,281.72 Husband listed on his financial statement was a reasonable value for his two franchises at the time of trial. For comparison, he testified that the average value of the 65 stores he had evaluated was approximately $2 million per store.

Mr. Pascal believed that Husband had a total net worth of more than the $4,759,872.33 figure listed in his financial statement based on the fact that Mr. Pascal could not assign a value to some of the additional business entities. He explained that Husband had approximately ten businesses, ranging from the investment in Nigeria to a project in Tunica, for which they had little to no information. Mr. Pascal testified that the outstanding bill for his firm's work was $52,108. He explained that the cost was so high because Husband chose to unnecessarily complicate matters and conceal information during the investigation.

The next expert to testify for Wife was Ted Scott, a certified computer examiner. Mr. Scott testified that Husband delivered his laptop directly to him on September 28, 2018. He determined that Husband's laptop was last used on August 14, 2018 (the day after the trial judge entered the last injunction prohibiting Husband or his agents from destroying, deleting, or erasing any files from his computers). Mr. Scott found evidence that a software tool called CCleaner had been installed on the laptop and that it was used to permanently erase 175,000 files beginning shortly before midnight on August 13 and ending in the early morning hours of August 14. He explained that CCleaner has two methods of erasure. The first is the default method. Mr. Scott testified that "as a forensic examiner," when he examines a device after the normal erasure method has been executed, he still expects to

- 12 -

be able to recover the deleted files. The second method, he explained, requires a feature "buried a few levels deep" within the software that must be intentionally activated by the user. In that case, the user specifies that he or she wants the files to be "securely" deleted. Mr. Scott explained that the files on Husband's computer were intentionally and permanently deleted using this second method. He testified that the files specified for secure erasure were gone, but other items that would usually be deleted during a default erasure, such as internet history, were not. As such, he said this was not just some file deletion "in mass." He stated, "This does not happen accidentally." He also said that the CCleaner software tool had been installed on the computer just a few days before its execution.

The next witness Wife called was Fred Tillman, who had purchased the two McDonald's franchises from Husband in 2014. Although Mr. Tillman had recently sold his own restaurants, Mr. Tillman had been a McDonald's franchisee for nearly fifty years and owned approximately 72 restaurants over the course of his career. Mr. Vance's firm, Forensic Valuation Services, had valued 65 of those restaurants, which were those mentioned during the testimony of Mr. Pascal. Mr. Tillman said that Husband's two stores were currently "under-performing," so he opined that the average value of around $2 million per store for *his* 65 stores would not be a realistic value for Husband's stores. He testified that Husband had been "in breach" of his franchise agreements with McDonald's in the last couple of years and had borrowed money from him "to bail him out" once or twice. Mr. Tillman acknowledged that when he bought the two other stores from Husband in 2014, he had encountered the same issue with Husband "indicating he had expenses on the stores that really didn't relate to the business" and "attempting to say his cash flow was higher than maybe I considered it was."

Mr. Tillman had known Husband for thirty years and mentored him as an owner-operator. He acknowledged that Husband had sent him many emails gauging his interest in various business ventures, even throughout the divorce proceeding. These had included a casino in Tunica, a spicy chicken franchise, the Nigerian scrap metal recycling project, and a cannabis business. Mr. Tillman also identified an email that Husband had sent to him during the divorce proceeding simply stating, "Low, low, low is most helpful," to which Mr. Tillman responded, "We have experience at low valuations." Mr. Tillman testified that he and Husband always talked about the values of restaurants in a "humorous" manner.

One of Wife's attorneys, Jessica Ferrante, testified as well. She described the difficulties Wife encountered in obtaining information from Husband, the involvement of Mr. Vance and Mr. Pascal, information that Wife and her attorneys found independently that Husband had failed to disclose, and the dispute at the deposition when Husband ran from the courthouse with his phone. She said that Wife had actually found two financial statements in which Husband had valued the parties' estate during the pendency of the divorce. She explained that his financial statement for 2017 had listed a net value of $8

- 13 -

million, and the one for 2018 listed almost $5 million.  Ms. Ferrante testified that Husband initially "denied having any part in them," but after Wife took the deposition of a bank employee who testified that Husband submitted them, and she retained a handwriting expert who verified his signature, Husband finally admitted to signing them.

Husband called several fact witnesses of his own.  His accountant, who resided in Pennsylvania, testified regarding the parties' joint tax returns from past years.  He also testified that he regularly compiled other financial documents related to Husband's franchises, including financial statements and year end statements.  He said that information from the compilation was transmitted to McDonald's Corporation on a monthly basis and that he also provided the monthly statements to Husband every month.  The accountant testified that the information he received for these documents came from Husband and that he did not independently investigate the information.  However, the "pre-debt cash flow" he had recorded for the two stores in recent years were:  $379,613 in 2015; $492,661 in 2016; $262,973 in 2017; and $76,036 in 2018.

Another witness, Allen Perlman, testified about Husband's involvement with the project in Nigeria regarding recycling of scrap metal.  Mr. Perlman had a background in recycling scrap metal and consulted with Husband about the feasibility of the project.  Mr. Perlman testified that he and Husband had taken two trips in connection with the project.  The first was to London, and Husband and his brother paid for all expenses for Mr. Perlman, including his hotel, flight, food, and every expense he incurred for the five days he was there.  The second trip was to Nigeria, where Husband, his brother, and Mr. Perlman were accompanied by three other individuals.  Mr. Perlman testified that Husband and his brother paid for everything, in addition to Mr. Perlman's consulting fee.  In Mr. Perlman's opinion, this was a legitimate business opportunity, although it never materialized.  Two other individuals also testified about these trips.

Husband's brother testified that he split the cost of the trips for the Nigerian project "50-50" with Husband.  He also testified about the two McDonald's franchises he currently owned and acknowledged the commingling of money between him and Husband, although he said they "reconcile" at the end of the month.  Husband's brother had, in the past, owned two additional stores, which he also sold to Mr. Tillman in 2014.  The "total net proceeds" from the sales of his two stores was in the "ballpark" of "well over $3 million."

The bookkeeper for Husband and his brother, Nancy Anders, testified as well.  Ms. Anders said she had printed hundreds of thousands of pages of documents during the divorce, in addition to requesting information from accountants, banks, and other entities.  She agreed that Husband and his brother routinely paid bills for each other, but she said they kept track of such payments and paid each other back at the end of each month.  Janelle Carter was also employed by Husband and had been working for him for twenty-five years.  Ms. Carter testified that she was the one who prepared the 2018 financial statement after it was requested by the bank.  She initially said that she got the balances from Ms. Anders,

the bookkeeper, that she probably did not consult Husband before filling it out, and that she "[m]ost likely" just showed it to him before she submitted it, asking something like "how does this look, and he said fine." Ms. Carter claimed that the figure of $4,099,281.72 listed for the two McDonald's restaurants was the previous year's gross sales and that she had entered that number because she thought the value of the restaurants was equivalent to "dollar for dollar sales" and that this was "just kind of a loose rule to evaluate a restaurant." She also claimed that she had used a rubber stamp for his signature. On cross-examination, however, Ms. Carter was shown Husband's admissions in which he had finally admitted to signing the financial statement and that he compiled and provided all of the information to create the net worth of $4.7 million. At that point, Ms. Carter said "[w]e probably did it together" and that it was hard for her to remember.

Husband also presented testimony from Phillip Carter, who was Janelle Carter's brother-in-law. He testified that he had been performing routine maintenance on Husband's business computers for years. He said he was not an employee but was "contracted" to do monthly maintenance. Mr. Carter testified that about once a month, he went to Husband's office to "clean computers" and see if there were any complaints or viruses. He testified that he had used CCleaner on all of the computers "from the get-go" and that he ran it routinely. Mr. Carter said he did not choose "what to delete or clean up" and that the process was "pretty automatic" because "[t]he cleaner does that." He claimed that Husband's laptop was one of the devices he routinely subjected to his cleaning process. He was asked specifically about his actions in August 2018 and said that he performed "[j]ust another routine cleaning," with nothing standing out in his mind about the devices. Mr. Carter testified that Husband never told him to delete anything in particular off of the devices. He said he was not aware of any injunctions that prohibited Husband or his agents from deleting files and that he had been performing these duties throughout the divorce proceeding. Wife's counsel asked Mr. Carter about the testimony of the forensic examiner that CCleaner had only been installed on Husband's laptop only a few days before it was executed. Mr. Carter said this was because "they regularly do updates and you have to probably once a week put a new version on there."

Finally, the trial court heard testimony from Husband. He said that his monthly income and expense statement had listed $17,059.79 in income and expenses because "[e]verything that typically we do we just end up running through the business." Husband testified that these paid expenses equated to his "income" and that the two McDonald's stores were his only source of income. When asked about the comparatively small amounts reflected on his tax returns and whether he had committed tax fraud, his attorney advised him to "assert the Fifth," which Husband did. Husband testified at length about numerous debts he claimed to owe, stating, quite simply, "I just owe everybody." However, he admitted to spending $297,000 on the potential investment in Nigeria.

Husband identified his admissions regarding the financial statements. Specifically, he had admitted to submitting a loan application to a bank in January 2017 listing a net

worth of over $8 million and that he compiled the information supporting that sum. He also admitted to compiling the information for the January 2018 financial statement that was provided to the bank, showing a net worth of over $4.7 million. However, he testified that the figure used for the stores was "based on dollar for dollar sales, not the amount that I could sell the stores for." Husband testified that since the divorce proceeding started, he had been trying to sell the stores, and he added, "[h]opefully about 600,000 is all I can get right now" for the two stores together. However, he said that he was "trying to keep" the restaurants so that he could continue paying Wife and maintaining insurance through the stores after the divorce.

Regarding the criminal contempt petition, Husband denied that he personally did anything to intentionally delete files from the laptop or asked anyone else to do it for him. He said Mr. Carter had performed routine maintenance for the business for years, and it was Mr. Carter's maintenance that "took stuff off of there." He denied trying to hide anything from the court or Wife's counsel.

The four-day divorce trial concluded on October 17, 2019. In December 2019, the trial court entered an order stating that the deadline for proposed findings of fact and conclusions of law had already been extended once due to transcripts not being ready and that Husband had requested an additional continuance due to his counsel not yet having money from Husband to purchase the trial transcripts. The court granted Husband an additional extension over Wife's objection. Each party finally submitted their proposed findings on December 18, 2019. It appears that the case then sat dormant for the entirety of 2020. In January 2021, Wife filed a motion for a status conference. She then filed a motion for a ruling. A hearing was held in April 2021, at which the trial judge apologized and acknowledged that the final order was "long overdue." A fifty-page final decree of divorce (plus attachments) was then entered on May 18, 2021.

At the outset, the final decree explained that Husband's complaint for divorce had been dismissed pursuant to a sanctions order. It noted that Wife's counter-complaint for divorce alleged that Husband was guilty of inappropriate marital conduct and adultery. The trial court found that "Husband stipulated that he was guilty of inappropriate marital conduct and that he was at fault for the demise of the marriage." Wife was awarded the divorce "based upon Husband's admission that he is guilty of inappropriate marital conduct."

Regarding the marital property, and specifically the value of the McDonald's restaurants, the trial court found that Husband had valued the two restaurants at $4,099,281.81 when he prepared a financial statement when applying for a loan from a bank on January 25, 2018. The court noted that this financial statement valued the marital estate at $4,759,872.33. The court also noted that Wife's counsel had received the financial statement from the bank in response to a subpoena and that Husband had initially denied signing it. The court found that Husband finally admitted to signing the document after

- 16 -

Wife's counsel took the deposition of the bank officer and hired a handwriting expert to prove that it was his signature. The trial court acknowledged that Janelle Carter attempted to dispute the accuracy of the financial statement at trial by testifying that she and another employee prepared it, signed it with a rubber stamp, and only showed it to Husband after she had completed it. The court found that "[t]he fact that Ms. Carter continued to perpetuate the falsehood that she prepared the financial statement despite Husband's admission, casts all of her testimony as untrustworthy."

The trial court recognized that Wife had taken Husband's number from Husband's financial statement and "updated it" by adding some additional assets and liabilities that she had learned about during the litigation, from work done by her attorneys and experts. The court noted that Wife listed some assets with "Unknown" values. Notably, however, the trial court stated that out of all the assets and liabilities listed on Wife's Rule 14(c) statement, the only valuation that Husband disputed at trial was the value of the two McDonald's restaurants. The order noted that Wife ultimately proposed valuing the marital estate at a minimum of $5,000,895.54 given Husband's concealment of information, even though she believed the value to be greater.

The trial court found that throughout the litigation, "Husband has refused to be forthcoming with information[,] refusing to follow this Court's orders on discovery, and has been repeatedly sanctioned by the Court[.]" Considering the history of the case, the court's previous orders, and the evidence presented at trial, the court found that "Husband is not credible."

The trial court discussed the parties' recent tax returns and various figures recited during the testimony of Husband's accountant. However, it also noted that the accountant accepted the values provided by Husband "at face value" and did not investigate their validity. The court found that Husband's accountant had provided him with a copy of all the monthly statements submitted to corporate but that "[Husband] never provided a copy of any of the reports to Wife, her counsel or Mr. Rob Vance's office." The order noted, "Mike Pascal works with Rob Vance at Forensic & Valuation Services, PLC who was appointed by the Court to perform a forensic evaluation of the parties' finances and the two McDonald's restaurants." It also noted that Mr. Pascal is a forensic accountant who worked under Mr. Vance's supervision.

The trial court found that "Husband's failure to cooperate in providing information made identifying and valuing assets in this case more difficult." Regarding the value of the restaurants, the order states:

> 88.  Mr. Pascal, through his employment at Forensic & Valuation Services, PLC, has had the occasion to value sixty-five (65) McDonald's franchises in the last two years for his work on another matter and used that industry and proprietary knowledge in forming his opinions of the parties'

two McDonald's franchises.

89. His experience valuing other McDonald's gave him a base of knowledge that Corporate would typically value a store based upon a cash flow multiplier, usually 4[.]75, however he was unable to use the pre-debt cash flow method, due to Husband running personal expenses through the business and the fact that Husband was not forthcoming with necessary values.

90. Mr. Pascal testified that these two (2) McDonald's stores were in well-established areas which would help with the cash flow of the stores.

91. Mr. Pascal testified that based upon his investigation to a reasonable degree of certainty the value of the two restaurants was $4,100,000.00 excluding any debt obligation which was consistent with the Husband's valuation on Husband's Financial Statement.

92. Husband argued that the Court should use the pre-debt cash flow method of $76,000.00 the two stores combined would only have a gross value of $1,092,500.00 and a net value of $600,000.00 less the debt attached to the businesses, however no documentation or expert testimony was presented to support these valuations.

93. Husband never provided any basis to Mr. Pascal as to why income dropped dramatically from a high of $492,000.00 in 2016 to $76,000 in 2018.

94. Husband claims that sales are down 20% at both stores due to a new McDonald's in the area and a Taco Bell opening across the street but would still not account for the dramatic change in monthly values.

95. The lease on the Collierville store began in 2003 and is set to renew in 2023.

96. Husband states that Corporate wants all of the stores to be remodeled adding kiosks, new menu boards, etc. One of the stores will also need a new roof all of which he expects will be as much as $860,000.00.

97. Husband claims that he is presently behind on his rent payments to Corporate in the amount of $80,000.

98. Husband further claims that he is behind on his payroll withholding tax in the amount of $100,000.00 and sales tax payment in the amount of $25,000.00.

99. All improvements to the stores would be expenses that he would have to bear[.]

100. While passionately asserting the dire state of affairs of the restaurants Husband offered no documentation from Corporate or the State of Tennessee to support his allegations of his delinquencies.

101. Wife offered to the Court that the value of the two (2) McDonald's franchises was $4,099.281.72.

102. Wife's value was further supported by the expert testimony of Michael Pascal.

103. The most reliable evidence of the values of the two (2) McDonald's

franchises comes from Husband's financial statement and Mr. Pascal's testimony validating the values in Husband's financial statements.

The trial court also adopted Wife's proposed value of the marital estate:

> 130. Mr. Pascal testified to the difficulty in valuing the marital estate in this case due to Husband not being forthcoming with information. This necessitated Mr. Pascal to expend extra time and effort to complete his valuation needing to make numerous requests for information, some of which was never provided.
> 131. Mr. Pascal's testimony supported Wife's position that the total value of the marital estate was $5,000,895.54.

The court noted that Husband was involved in at least ten businesses but that little information was provided to Mr. Pascal regarding them, so he was unable to assign a value to them. The court found that Husband "was constantly looking for the next big deal to invest in, which included: purchasing a chicken franchise, developing property in Tunica, and recycling Nigerian scrap metal, among other ideas." It noted that Husband and his brother spent thousands on the Nigerian project alone, funding the trips for everyone who accompanied them. It found that he continued to invest in and/or explore business opportunities throughout this litigation without consulting Wife.

After analyzing each of the relevant statutory factors for consideration, the trial court proceeded to divide the marital property. According to the order, Husband received "the vast majority" of the marital assets, including all income earning assets, while Wife received "relatively few marital assets" but was awarded alimony in solido. Husband was ordered to pay Wife $2,352,258.66 in alimony in solido, "representing one-half of the minimum net value of the marital estate including assets and debts," with a due date of one year from the date of the divorce decree. The trial court stated that the overall distribution of the marital estate resulted in Wife receiving more than Husband, but in light of all the statutory factors and the fact that Husband received numerous business entities with unknown values, the court found the disparity was appropriate. The trial court's attached spreadsheet listed 56.86% of the estate being distributed to Wife and 43.14% being distributed to Husband.

Wife was also awarded alimony in futuro, and Husband was ordered to pay Wife's attorney fees and the accountant fees as alimony in solido. The order stated that the attorney fee award constituted "a judgment to Wife and Wife's counsel . . . for which execution may issue." It stated that the accountant fee was due within thirty days, and if not paid in full, "Forensic & Valuation Services, PLC, is awarded a judgment . . . for which execution may issue."

In addition, the final decree mentioned that the court had previously entered

judgments against Husband over the course of the divorce proceeding, and the final decree stated that Husband still owed a balance toward those previous judgments. The final decree stated that the previous judgments were "reaffirmed and reduced to judgment for which let execution issue, if necessary." Regarding the remaining civil contempt petition, for unpaid temporary alimony, the trial court found that Husband's "testimony on his inability to pay was not credible." It entered an additional judgment for the unpaid temporary alimony and related expenses.

Finally, the court addressed the issue of criminal contempt, which, the court stated, "was heard during the final divorce trial, by agreement of the parties and their counsel." Initially, the court explained that a mandatory mutual injunction went into effect upon the filing of the divorce complaint in 2016, which prohibited both parties from "[h]iding, destroying or spoiling, in whole or in part, any evidence electronically stored on computer hard drives or other memory storage devices." The court further noted that it entered an injunction on July 31, 2018, providing that Husband and any person acting on his behalf was "enjoined and prohibited from destroying, deleting, or erasing any files or documents from any device, computer, cell phone, hard drive, memory card, and any backups." The court found that a subsequent injunction, entered on August 13, 2018, again provided that Husband and anyone acting on his behalf was prohibited from "destroying, deleting, or erasing any files or documents." Next, the trial court discussed the testimony of Wife's expert witness, Ted Scott, the certified computer examiner who was stipulated as an expert in computer/technology forensic analysis. The court described in detail Mr. Scott's testimony that CCleaner was used to permanently erase 175,000 files on August 13 and 14, 2018. It noted his testimony that the program required the user to specifically identify the files to be permanently deleted, and that the files would have been recoverable under the default setting. The court found that the program was installed only days before the deletion took place, which was after court orders prohibiting Husband or anyone on his behalf from deleting electronic files. The court noted that Mr. Scott's opinions were "to a reasonable degree of computer forensic certainty," and he had concluded that the permanent deletion was intentional.

The court also discussed the testimony of Husband and Phillip Carter, who was the brother-in-law of Janelle Carter. The court concluded that Mr. Carter's testimony about this being a routine cleaning conflicted with the fact that CCleaner was downloaded to Husband's laptop only days before the deletion. The court noted Husband's testimony that he did not ask anyone to delete the files but emphasized that Husband did not inform Mr. Carter about the court orders not to delete information from computers. The court added, "Husband was very aware of the injunctions and the ongoing search for information." The trial court ultimately concluded that "Mr. Carter was not a credible witness," considering that the files were intentionally deleted, Husband knew the information was being actively requested by Wife's counsel, and the "pattern of behavior" by Husband during that time. The court discussed the statutory authority for a finding of contempt and the four elements that must be shown. Even though Husband denied that he "personally violated" the order,

the court found that, "at a minimum, Husband allowed an individual to delete information from his laptop in violation of court orders" and "took no steps to stop the deletion of information from this laptop" despite multiple orders being entered on that issue. "Further," the court added, "Husband's credibility has been so soiled through his actions in this litigation and repeated misstatements under oath that this Court has little faith in Husband's version of how this violation occurred." Considering all the facts, including the testimony of Mr. Scott, Husband's lack of credibility, Mr. Carter's inconsistent testimony and the fact that he was employed by Husband, the court concluded that the violation was willful, intentional, and done with a culpable state of mind. Thus, the court found he was in criminal contempt. He was ordered to serve the ten days in jail, over five consecutive weekends, with any further sentence suspended pending his compliance with the final decree of divorce. All remaining petitions and motions were denied.

Less than a month after the divorce decree was entered, Husband filed a notice of substitution of counsel, stating that his former attorney had been relieved as counsel of record. That same day, Husband's newly retained attorney filed a "Motion for New Trial." He argued that a new trial was warranted for four reasons: "(1) the date of value of marital property was not ascertained as near as possible to the entry of the final decree of divorce, (2) the Court's appointed expert, Robert Vance, did not testify or render a report, (3) Mike Pascal failed to utilize a valid valuation method, and (4) the Court appointed expert lacked neutral impartiality." Regarding the valuation date, Husband argued that the trial court erred in relying on the financial statement from the year before trial and "did not take into account any current information regarding the parties' businesses." He also argued that this error was compounded by the fact that a year passed between the last trial date and the entry of the final decree. As a result, Husband argued that the valuation failed to comply with Tennessee Code Annotated section 36-4-121(b)(1)(A). He asked the court to order a new trial and allow the parties to engage in discovery regarding the current value of the marital assets. Next, Husband argued that "[t]he expert witness relied upon was not the expert appointed by the Court." He noted that the order regarding Mr. Vance did not mention his firm or Mr. Pascal. Husband argued that the trial court had appointed an expert pursuant to Tennessee Rule of Evidence 706 yet failed to comply with the procedures for doing so. Third, Husband argued that the valuation method Mr. Pascal used was contrary to Tennessee law because the market approach to valuation is typically used for public corporations, not closely held corporations. He also argued that Mr. Pascal should have utilized the release Husband was ordered to execute early in the proceeding to gain information directly from Husband's accountant even though Husband failed to provide it himself. Finally, Husband argued that Mr. Vance, Mr. Pascal, and their firm were "not impartial experts." Again relying on Tennessee Rule of Evidence 706, Husband suggested that Mr. Vance should have been a neutral expert. However, he argued, "From the moment Rob Vance was first mentioned in a Motion before this Honorable Court he had aligned himself with Wife, becoming an advocate for her cause." To illustrate, he noted that the motion asking the court to appoint Mr. Vance attached affidavits from him stating that Husband was concealing information, those affidavits were notarized by Wife's counsel's

paralegal, Wife's counsel worked with Mr. Pascal on deficiency lists throughout the proceeding, and Mr. Pascal's trial testimony "indicates a close relationship with Wife's counsel as an advocate." For all these reasons, Husband's newly retained counsel argued that the trial court should order a new trial.

Wife filed a response to the motion for new trial. Regarding the date of valuation, she insisted that Mr. Pascal considered the information available to him but noted that Husband controlled the flow of information regarding his franchises, which made valuation more difficult when he repeatedly failed to comply with orders to produce information. She noted the sanctions order prohibiting Husband from introducing information that he had not produced by the date of a contempt hearing in 2018. Thus, she suggested that Mr. Pascal did the best he could with the information he had in order to formulate a valuation as of the date of trial, and it was disingenuous for Husband to complain about outdated information when he was "the architect of his own dilemma." She also argued that the delay in entering the final decree did not warrant relief considering the closing of the courts due to COVID-19 and the significant difficulties created by Husband's behavior. Wife contended that Husband only complained about the delay after an unfavorable ruling. She attached an email in which her counsel had asked Husband's counsel, after a year of waiting for the final order, if he would agree to a joint request for a status conference for an update on the status of the ruling. Husband's counsel had responded, "Why kick a sleeping dog?" Wife ultimately filed the motion for a status conference and motion for a ruling on her own.

As for Husband's argument regarding Mr. Pascal and Mr. Vance, Wife contended that the trial court did not appoint an expert pursuant to Tennessee Rule of Evidence 706. Wife explained that she had requested "pendente lite assistance" during the hearing before the divorce referee but that it was ultimately necessary to direct her request for "ongoing pendente lite" expert fees to the trial judge. She claimed that this request "allow[ed] Wife financial access to have forensic accounting work done during this case." Thus, she argued that the court had ordered Husband to pay a pendente lite award of litigation expenses "for Wife's forensic accountant." Wife agreed that these were not neutral experts but "Wife's experts that were ordered to be paid for by Husband as pendente lite litigation expenses during the divorce." She noted that the order on the scope of proof at trial stated that "Wife's experts may testify." To the extent that Husband further argued about the use of Mr. Pascal rather than Mr. Vance, Wife asserted that Mr. Vance transacts business as Forensic & Valuation Services, PLC, and that Mr. Pascal was employed by that firm and acting as its agent. Finally, she noted the stipulation of Husband's prior counsel that Mr. Pascal was an expert and that voir dire was unnecessary. She claimed that Husband was "well aware that Mr. Pascal and Mr. Vance worked hand-in-hand" and that Mr. Pascal's appearance at trial served to save money due to his lower rate. Regarding the method of valuation, Wife argued that Mr. Pascal used one of several acceptable methods and that Husband should not be allowed to complain about the fact that a preferred method was not used when his own actions prevented the use of another method.

After a hearing, the trial court entered an order denying the motion for new trial. To begin, the trial court clarified that "Robert Vance was a retained expert by Wife, [and] counsel for Wife sought relief from the Court to require Husband to pay for the necessity of retaining the expert." The trial court stated that Husband could have retained his own expert, subject to the orders of the court, to provide a competing opinion. Regarding the involvement of Mr. Pascal, the court noted his testimony that he worked with Mr. Vance in creating valuations and that he testified as a cost saving measure to reduce the expenses incurred by the parties. The court further found "[t]here was a stipulation that agreed that Mr. Pascal was going to be certified as an expert, and he was able to testify on behalf of Mr. Vance's office."

As for the method of valuation, the trial court found that Husband was not forthcoming with information and "elected not to provide necessary information on his businesses, on repeated occasions, despite Orders on Motions to Compel and Motions for Sanctions." The court stated that "doing a cash flow valuation was not possible" as a result of Husband's failure to provide the necessary information regarding the cash flow of the business. As such, the court explained, Mr. Pascal had utilized the market approach, which was a viable methodology for valuing businesses. During his oral ruling at the hearing, the trial judge also rejected Husband's argument about using the release to obtain more documents from the accountant, noting that the record was "replete" with petitions due to Husband's failure to produce information. He pointed out that it was Husband who was under orders and obligations to provide the information and that he elected not to do so on repeated occasions. As the trial judge put it, "this was very much a case of hiding the ball, and that was the problem."

As for the delay, the trial judge expressed his regret about that issue during the hearing but said that this was probably the lengthiest divorce decree he had entered in his career. In the written order, the trial court said it had considered entering the final decree nunc pro tunc but feared that doing so would impose a hardship on Husband due to obligations becoming past due immediately. However, the court said that if the timing of the decree was a concern and both parties agreed, the court would enter the decree nunc pro tunc. Husband filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Husband presents nine issues for review, which we have quoted directly from his brief on appeal:

> 1. Whether the trial court erred when it entered the Final Decree of Divorce nearly 1.5 years after the trial in this matter whereby not valuing the assets at a point in time close enough to the entry of the Final Decree of Divorce;

> 2. Whether the trial court erred when it made a division of marital assets that

failed to consider the factors elucidated in Tennessee Code Annotated Section 36-4-121 appropriately;

3. Whether the trial court erred when it failed to include information on the marital balance sheet, resulting in an inequitable division of the marital estate;

4. Whether the trial court erred when it allowed the substitution of a court appointed expert Rob Vance for Mike Pascal;

5. Whether the court appointed expert appointed under rule 706 owed a duty of impartiality;

6. Whether the trial court erred when it used an improper valuation method of Husband's restaurants;

7. Whether the trial court erred when it awarded judgments to persons not a party to the action;

8. Whether the trial court erred when it awarded a divorce on the grounds of inappropriate marital conduct when no party stipulated to specific grounds for Divorce and no proof was submitted to the trial court on grounds; and

9. Whether trial Court errored [sic] by finding Husband guilty of criminal contempt without articulating whether such finding was beyond a reasonable doubt and contrary to the evidence submitted at trial.

In her posture as appellee, Wife raises one additional issue:

1.  Whether Wife is entitled to her attorney's fees and costs for this appeal.

For the following reasons, we affirm as modified and remand for further proceedings.

## III.   DISCUSSION

### A.    *Grounds for Divorce*

We will begin with the issue Husband raises regarding the grounds for divorce.  He argues that "the trial court erred when it awarded a divorce on the grounds of inappropriate marital conduct when no party stipulated to specific grounds for Divorce and no proof was submitted to the trial court on grounds."

Tennessee Code Annotated section 36-4-129 provides:

(a) In all actions for divorce from the bonds of matrimony or legal separation *the parties may stipulate as to grounds* and/or defenses.

(b) *The court may, upon stipulation to* or proof of *any ground of divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault* or, if either or both parties are entitled to a divorce or if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone.

(emphasis added). Husband's argument with respect to this issue is a bit perplexing. He admits to stipulating to "grounds" for divorce, that he was one hundred percent at fault, and that Wife was entitled to a divorce. Husband then argues that the trial court erred by allowing the parties "to stipulate to a divorce without specifying the grounds for divorce." Without citing any caselaw in support, Husband argues that "if the parties are to stipulate, the parties must stipulate to at least one (1) of the fifteen (15) grounds for divorce listed in Tennessee Code Annotated Section 36-4-101." He claims that "[p]arties cannot stipulate to an unnamed reason for divorce and be awarded a divorce because of it." Thus, Husband further argues that the trial court erred in awarding a divorce on the ground of inappropriate marital conduct in the absence of a stipulation as to that particular ground.

From our review of the record, it does not appear that the trial court interpreted the stipulation in the same manner as Husband has characterized it on appeal. Again, Wife's counter-complaint for divorce alleged inappropriate marital conduct and adultery. The order on the scope of proof at trial stated, "Husband stipulates that Wife is entitled to a divorce." Husband's pretrial memorandum stated, "[Husband] agrees that [Wife] shall be awarded the divorce on stipulated grounds." The attorneys' discussion at the beginning of trial bears repeating:

[Wife's counsel]: Quickly on grounds, we've got a – [Husband's counsel] said the last time we were in court that he would stipulate to the grounds, but the grounds that we pled were inappropriate marital conduct and adultery.
We can't get a stipulation *on the adultery*, and we're going to put on very limited proof because [Husband] has admitted to multiple affairs with at least a few women. Because they want him to be 100 percent at fault because of demise in the alimony award.

THE COURT: Well, again, if *everyone stipulates that he's guilty of inappropriate marital conduct*, then I don't know that I need to hear, you know –

[Husband's counsel]: The way the statute is written is all you have to do is just stipulate to grounds pursuant to 36129 [sic]. That's all you have to do.

[Wife's counsel]:  As long as he's 100 percent at fault.

THE COURT:  That's fine.

[Wife's counsel]:  Okay.  Then we can move past that.

(emphasis added).  The final decree of divorce stated that Husband stipulated that he was guilty of inappropriate marital conduct.  To the extent that Husband now says he did not actually stipulate to any particular ground and that the trial court erred in allowing this, he created the very error of which he complains on appeal.  He now contends that "[p]arties cannot stipulate to an unnamed reason for divorce and be awarded a divorce because of it." However, before the trial court, he argued the exact opposite.  When Wife's counsel announced her intention to introduce proof of specific grounds, Husband's counsel insisted that "all you have to do is just stipulate to grounds."  We express no opinion as to the merits of Husband's argument on appeal or the one he made in the trial court.  We simply decline to address the issue because, if there was an error, Husband is responsible for it.  "A party is not entitled to relief on appeal based upon an error for which [he or] she is responsible." *Dunlap v. Dunlap*, 996 S.W.2d 803, 817 (Tenn. Ct. App. 1998) (holding that the defendant could not be heard to complain on appeal that the trial court erred in using a certain valuation date in light of the argument of his own trial counsel).  In addition, "a party will not be permitted to take a position on appeal that is contrary to a position in a lower court proceeding."  *Johnston v. Houston*, 170 S.W.3d 573, 577 (Tenn. Ct. App. 2004).  On this issue, Husband was the author of his own misfortune.

We further conclude that it is not necessary to consider the alleged error in this case in light of Husband's stipulation that Wife was entitled to a divorce and that he was one hundred percent at fault.  A husband made a similar argument in *Truman v. Truman*, No. E2009-00237-COA-R3-CV, 2010 WL 323066, at *5 (Tenn. Ct. App. Jan. 28, 2010), insisting that the trial court erred in finding that he had an extramarital affair even though he had "stipulated that Wife had grounds for a divorce."  In other words, "Husband did not object to Wife being granted a divorce, but rather to the divorce being granted on the basis of an extramarital affair."  *Id.* at *4 n.3.  We said:

> We do not find it necessary, or appropriate, to address the trial court's reliance on Husband's relationship with a female friend as a basis for the court's determination that Husband was guilty of inappropriate marital conduct.  This is because the record is clear that Husband stipulated that Wife had grounds for divorce.  Husband's stipulation, standing alone, is a sufficient basis for the trial court's award of a divorce to Wife; the remainder of the trial court's musings on the subject are unnecessary surplusage.  The issue raised by Husband with respect to the "extramarital affair" is simply not germane to the issue of divorce because the trial court did not expressly

base its "inappropriate marital conduct" determination on an act of adultery. Since Husband's stipulation supports the trial court's award of a divorce to Wife, we do not need to decide, and do not decide, whether Husband's contact with his female friend amounts to inappropriate marital conduct.

This court has observed that "[w]hen a ground for divorce has been stipulated or proven, the trial court may award a divorce to a party less at fault or declare the parties divorced; such choice is left to the trial court's discretion." *Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2004 WL 1882413, \*4 (Tenn. Ct. App. W.S., filed Aug. 9, 2005); Tenn. Code Ann. § 36-4-129(b) (2001). In this case, the trial court expressly found "fault, as always, on both parties," but awarded a divorce to Wife. There is no error in the trial court's award.

*Id.* at \*5-6. We reach the same conclusion here. Husband stipulated that he was one hundred percent at fault, that grounds for divorce existed, and that Wife was entitled to the divorce. The trial court awarded Wife the divorce. Husband does not point to any prejudice from the specification of inappropriate marital conduct. He is not entitled to relief on appeal.

### B. Expert Testimony

Next, we will consider Husband's issues regarding the roles of Mr. Vance and Mr. Pascal in this case. The first issue he raises is whether the trial court erred "when it allowed the substitution of a court appointed expert Rob Vance for Mike Pascal." The second issue he presents is "[w]hether the court appointed expert appointed under rule 706 owed a duty of impartiality." For both issues, Husband relies on Tennessee Rule of Evidence 706, which states:

**Rule 706. Court-Appointed Experts**
**(a) Appointment**. The court may not appoint expert witnesses of its own selection on issues to be tried by a jury except as provided otherwise by law. As to bench-tried issues, the court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court ordinarily should appoint expert witnesses agreed upon by the parties, but in appropriate cases, for reasons stated on the record, the court may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness's duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness's findings, the witness's deposition may be taken by any party, and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party,

including a party calling the witness.

**(b) Compensation.** Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases and civil actions and condemnation proceedings. In other civil actions and proceedings the compensation shall be paid by the parties in such proportion and at such time as the court directs and thereafter charged in like manner as other costs.

**(c) Disclosure of Appointment.** Where a court-appointed expert is permitted otherwise by law to testify on an issue to be tried by a jury, no one may disclose to the jury the fact that the court appointed the expert witness.

**(d) Parties' Experts of Own Selection.** Nothing in this rule limits the parties in calling expert witnesses of their own selection.

Husband argues that the trial court contravened the plain meaning of Rule 706 by allowing Mr. Pascal to testify in place of Mr. Vance, and that the experts violated a duty of impartiality contemplated by Rule 706.

Husband's arguments, however, presuppose that Mr. Vance was appointed pursuant to Rule 706. As the trial court succinctly stated in its order denying the motion for new trial, "Robert Vance was a retained expert by Wife, [and] counsel for Wife sought relief from the Court to require Husband to pay for the necessity of retaining the expert." Our review of the voluminous record supports this conclusion. Early in the proceeding, prior to the pendente lite hearing before the divorce referee, Wife filed her statement of monthly income and expenses listing as an "[a]dditional need: Expenses for Robert Vance[.]" At the pendente lite hearing, Wife's counsel described the difficulties they were encountering in obtaining information from Husband and said: "we're going to show through the complexity of the business dealings why we need *as part of our attorney's fees* the money to hire Mr. Rob Vance, . . . forensic CPA, to be able to make sense of this." (emphasis added). Counsel added, "We'll produce the proof for Your Honor to see why we need Mr. Vance to come in and why Mr. Byrd should be required to pay that." During Wife's testimony, her attorney asked "what relief are you requesting from the Court today with respect to a forensic CPA?" She responded, "I am asking the Court that we hire a forensic CPA which is an expert in going through expenses and statements to find what is hidden." The divorce referee directed counsel to make that request to the trial judge instead. Wife then filed her "Motion to Appoint Rob Vance as Forensic Accountant and to Hold Husband Responsible for the Fees Incurred." She did not mention Rule 706 but included a section regarding "Husband's Ability to Pay" and asserted that the order on pendente lite support had already found her to be the economically disadvantaged spouse. The order granting Wife's motion found "a need for a forensic accountant to determine Husband's business dealings and values, assets and values, and Husband's income."

This Court considered a similar argument regarding the role of a forensic accountant

in *Daugherty v. Doyle*, No. M2013-02509-COA-R3-CV, 2014 WL 6453770, at \*13-14 (Tenn. Ct. App. Nov. 17, 2014). In that case, a shareholder argued that the trial court was justified in awarding him the expenses he incurred in hiring a forensic accountant because the accountant was "a court-appointed expert witness compensable under Tenn. R. Evid. 706(b)." *Id.* at \*14. We concluded that the record did not support his assertion. *Id.* The shareholder had filed a motion for a forensic accounting, which was granted, authorizing the accountant *hired by the shareholder* to access the entity's books and perform a forensic accounting. *Id.* However, the court did not follow the procedures set forth under Rule 706 for court appointment of an expert, nor did the order classify him as a court-appointed expert. *Id.*

Here, we acknowledge that the trial court's order did state that Mr. Vance was "appointed as a forensic accountant," but it is clear from the remainder of the record that he was Wife's expert and was not appointed pursuant to Rule 706. In fact, Husband has cited to numerous facts in his motion for new trial and in his brief on appeal which, he claimed, clearly demonstrated that Mr. Vance and Mr. Pascal were advocates for Wife throughout this proceeding. He argued, "From the moment Rob Vance was first mentioned in a Motion before the trial court, he had aligned himself with Wife, becoming an advocate for her cause." Husband argues that it was clear from Mr. Vance's initial affidavit that he had already been "working with Wife's counsel." That is precisely the point. It was clear all along that Mr. Vance and Mr. Pascal were Wife's experts. Husband's trial counsel even remarked while questioning Mr. Pascal during cross-examination, "[Wife's counsel] hired you, right?" We find no indication that the trial court appointed Mr. Vance to serve as an expert in the role contemplated by Rule 706. Rule 706 was never mentioned by anyone until Husband retained new counsel after the final decree was entered and filed a motion for new trial. Thus, we reject Husband's argument that the court violated Rule 706 by allowing Mr. Pascal to testify in place of Mr. Vance. For the same reason, we reject Husband's argument that Mr. Vance, Mr. Pascal, and their firm "violated a duty of impartiality" owed under Rule 706.[1]

### C.    *Marital Property Valuation & Division*

The next few issues we will address relate to the trial court's valuation and division of the marital estate. According to Husband's brief, "The only valuation on the Marital Balance Sheet that Husband contests i[s] the valuation assigned to the two (2) McDonald Franchises." However, he raises several other issues related to the division of the marital

---

[1] We note that Husband raises no issue on appeal regarding the propriety of ordering the payment of expert witness fees as pendente lite support. He merely suggested that Wife's motion did not explicitly "request that any payment of expert fees be in the nature of *pendente lite* support," so Rule 706 must apply. We agree with the trial court that Mr. Vance was an expert retained by Wife, and, as the trial court put it, she "sought relief from the Court to require Husband to pay for the necessity of retaining the expert." Having rejected the underlying premise for Husband's argument regarding the nature of Mr. Vance's role, then, his limited issues on appeal are meritless.

estate.

### 1.  Valuation Date & Delay

First, we consider Husband's contention that the trial court erred when it entered the final decree of divorce over a year after the trial concluded, which, he claims, resulted in it "not valuing the assets at a point in time close enough to the entry of the Final Decree of Divorce."  Initially, Husband relies on Tennessee Code Annotated section 20-9-506, which states:

> When any judge of any district tries a case without the intervention of a jury, whether the judge is required to reduce the judge's finding of facts to writing or not, the judge shall be required to render the judge's decision and have judgment entered in the case within sixty (60) days from the completion of the trial.

However, this statute "is directory only and not mandatory."  *Schaeffer v. Richard*, 306 S.W.2d 340, 343 (Tenn. Ct. App. 1956).  A party relied on this same statute in *Justice v. Sovran Bank*, 918 S.W.2d 428, 429 (Tenn. Ct. App. 1995), which involved a four-year delay between the trial date and final order.  At the outset, we noted that the appellant conceded that section 20-9-506 "has been held to be directory."  *Id.*  As for the delay, this Court acknowledged "a recurring problem" with delays in entering final judgments.  *Id.*  At the same time, however, we recognized the responsibility that attorneys bear as well:

> The attorneys for the parties are required to take all reasonable steps to obtain a timely resolution of the issues in their cases.  T.R.A.P. Rule 36 provides in pertinent part:
>
> > Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who *failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.* (Emphasis supplied).
>
> Attorneys are understandably reluctant to ask a busy trial judge to decide the issues in their case.  However, after a reasonable elapse of time, attorneys should file a joint motion with the trial court asking for a judicial determination of their case.  Zealous representation requires attorneys to take all reasonable steps to bring about a timely resolution of the clients' disputes.  See Rule 8, Code of Professional Responsibility, canon 7.  In this case, neither counsel sought relief and must bear some responsibility for the long delay.

*Id.* at 430.  Thus, the judgment was affirmed.  *Id.*

This Court's observation in *Justice* is particularly pertinent here, where Wife's counsel asked Husband's counsel if he would agree to filing a joint motion for a status conference after a year, and Husband's counsel responded, "Why kick a sleeping dog?" When pressed further as to whether Husband's counsel objected to a joint filing, he said, "How can I object? If I do, it looks like I'm dragging my feet. For the record: I don't object, but I don't like it either." Wife then filed the motion for a status conference and motion for a ruling on her own, rather than submitting a joint filing with Husband. Given Husband's failure "to take whatever action was reasonably available to prevent or nullify the harmful effect of an error," he is not entitled to relief on appeal. *See* Tenn. R. App. P. 36.

Next, Husband argues that the combination of the trial court's use of "outdated information" and its delay in entering the order resulted in a valuation of marital property that did not comply with Tennessee Code Annotated section 36-4-121. According to the Tennessee Supreme Court:

> Tennessee Code Annotated section 36-4-121(b)(1)(A) provides the following definition of marital property, in pertinent part:
>
>> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing *and* owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.
>
> (emphasis added).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 232 (Tenn. 2010). Thus, marital property includes "any property to which a right was acquired **up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date**[.]" *Murdock v. Murdock*, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at *12-13 (Tenn. Ct. App. Mar. 2, 2022) (quoting Tenn. Code Ann. § 36-4-121(b)(1)(A)) (emphasis in *Murdock*). *See also Bunch v. Bunch*, 281 S.W.3d 406, 412 (Tenn. Ct. App. 2008) ("[T]he Trial Court correctly valued Husband's 401k as of a date as near as reasonably possible to the final divorce hearing."). The trial court complied with this directive.

To the extent that Husband also contends that the trial court impermissibly utilized

"outdated" information at the time of trial, we disagree. The trial court repeatedly emphasized that Husband's failure to cooperate in providing information made valuing the assets more difficult. Husband cannot steadfastly refuse to produce information and then complain on appeal that the trial court failed to use the most recent figures. *See Wilson v. Wilson*, No. M2002-02286-COA-R3-CV, 2003 WL 22238953, at *3 (Tenn. Ct. App. Sept. 30, 2003) (finding a valuation date was "timely under the circumstances" when the husband "failed to deliver any financial information beyond that date despite an order from the trial court requiring further production," so on appeal, he was "precluded from asserting a premature valuation when such valuation [was] a product of his own doing").

## 2. Valuation Method

The next issue Husband raises is "[w]hether the trial court erred when it used an improper valuation method of Husband's restaurants." He argues that the trial court erroneously adopted Mr. Pascal's "market approach" to valuing the restaurants when that is not a valuation method typically used to value a closely held corporation. He also complains that Mr. Pascal utilized data from 65 other franchises instead of his own and relied on the 2018 financial statement. Husband contends that information about his stores "was available" to Mr. Pascal if he had simply pursued it through other avenues, as he could have compiled information from his monthly income and expense statement or used the release to gather more information from his accountant.

When it comes to the valuation of marital interests, "the applicable standard of review is deferential." *Telfer v. Telfer*, 558 S.W.3d 643, 656 (Tenn. Ct. App. 2018). Determining the value of a marital asset is a question of fact, and the trial court's decision regarding the value is given great weight on appeal. *Powell v. Powell*, 124 S.W.3d 100, 103 (Tenn. Ct. App. 2003). "In the face of conflicting opinions regarding the value of a marital asset, the trial court may place a value on the asset that is within the range of the values presented by the competent evidence." *Owens v. Owens*, 241 S.W.3d 478, 489 (Tenn. Ct. App. 2007) (citing *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998); *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)). Because "valuation evidence is inherently subjective, a trial court's valuation decisions need not coincide precisely with the valuation opinions offered into evidence." *Id.* (citing *Waits v. Waits*, No. 01A01-9207-CV-00288, 1993 WL 49564, at *3 (Tenn. Ct. App. Feb. 26, 1993)).

"Determining the value of a closely held company is not an exact science." *Gratton v. Gratton*, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *8 (Tenn. Ct. App. Mar. 28, 2006) (citing *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995); *Wallace*, 733 S.W.2d at 107). A trial court's wide latitude in determining the value of the marital estate "'extends to choosing the method for valuation of a closely held corporation.'" *Ogles v. Ogles*, No. M2013-02215-COA-R3-CV, 2015 WL 113336, at *4 (Tenn. Ct. App. Jan. 7, 2015) (quoting *Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2005 WL

1882413, at *9 (Tenn. Ct. App. Aug. 9, 2005)); *see also Powell*, 124 S.W.3d at 103 (rejecting the appellant's contention that valuing a business interest posed a question of law requiring *de novo* review). "There are a number of acceptable methods available" for determining the value of a business, including the market value method, the asset value method, and the earnings value or capitalization of earnings method, and there are still others, such as the dividend method and the liquidating value method.[2] *Wallace*, 733 S.W.2d at 107. The choice of the proper method, or even combination of methods, depends on the unique circumstances of each company. *Id.*; *see, e.g.*, *Bates v. Bates*, No. M2019-00505-COA-R3-CV, 2020 WL 3885958, at *5 (Tenn. Ct. App. July 9, 2020) (concluding that an expert's "alternate valuation method" was appropriate, combining the asset, income, and market value methods); *Duke v. Duke*, No. M2009-02401-COA-R3-CV, 2012 WL 1971144, at *8-9 (Tenn. Ct. App. June 1, 2012) (affirming the trial court's adoption of an expert valuation that used a "blend of the income approach and the net asset approach"); *Goodwin v. Goodwin*, No. E2009-01085-COA-R3-CV, 2010 WL 669244, at *6-8 (Tenn. Ct. App. Feb. 25, 2010) (affirming the application of a "weighted approach" that combined three methods and gave different weight to each). Simply put, "[t]he courts have not articulated a consistent approach to the valuation of this type of marital asset." *Wallace*, 733 S.W.2d at 107. "It can be a difficult exercise for any court." *Edenfield v. Edenfield*, No. E2004-00929-COA-R3-CV, 2005 WL 2860289, at *8 (Tenn. Ct. App. Oct. 31, 2005).

Husband argues that market-based approaches to valuation generally are not appropriate for closely held corporations like his McDonald's franchises. He claims that the preferred method would have been to use a capitalization of income approach. *See Bertuca v. Bertuca*, No. M2006-00852-COA-R3-CV, 2007 WL 3379668, at *5-7 (Tenn. Ct. App. Nov. 14, 2007) (reviewing testimony from several experts and concluding that "the preferred method" for valuing the husband's interest in a partnership that operated McDonald's franchises was "to determine its earnings value using a capitalization of income approach"). However, in the case at bar, it was Husband who failed to provide the information necessary to utilize a different approach. Mr. Pascal testified that he considered the market approach, asset approach, and income approach. He readily acknowledged that "[i]f [Husband] had provided us the information that we requested, we could have done this in a couple of different ways." However, he said that "[Husband] prohibited us from using any other method to determine the value." As the trial court stated in its order denying Husband's motion for new trial, "[a]s a result of Husband failing to provide the necessary information as to the cash flow of the business, doing a cash flow valuation was not possible."

We faced a similar situation in *Bettis v. Bettis*, No. E2016-00156-COA-R3-CV,

---

[2] Additionally, "[a]lthough not bound by it, Tennessee courts suggest Revenue Ruling 59-60 provides standard guidelines to value such a business." *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *6 (Tenn. Ct. App. July 28, 2009).

- 33 -

2016 WL 6161559, at *5-6 (Tenn. Ct. App. Oct. 24, 2016), in which a husband argued that the trial court erred in using the market value method to value his stock. We acknowledged that the market value method is most reliable where there is an established market for the stock. *Id.* at *6. In fact, this Court had previously stated:

'A *public* corporation's value is most reliably determined using the market value method. This method presumes that there is an established market for the corporation's stock which will enable the court to arrive at the price a willing buyer would pay for the stock. The stock in *closely held* corporations is rarely traded. Thus, it is improper to attempt to place a value on a closely held corporation using the method generally used to place a value on a public corporation.'

*Id.* (quoting *Wallace*, 733 S.W.2d at 107) (emphasis added). Despite this statement, however, in *Bettis*, we found very limited financial information in the record related to the business, and the wife's expert had used the figures provided by the husband in order to determine a value for his stock. *Id.* We said, "Although the market value method is generally not preferred in valuing a closely held corporation, the trial court was provided with no additional evidence to assist its valuation." *Id.* Under the circumstances, we found no reversible error in its valuation. *Id.* We reach the same conclusion here.

Like the trial court, we also reject Husband's attempts to place blame on Mr. Pascal for the absence of information. It was Husband who was repeatedly ordered to provide the necessary information and failed to do so.[3] Under the circumstances, Mr. Pascal found it appropriate to utilize a market-based approach for valuing the McDonald's franchises at issue. Based on his overall investigation and gross revenue analysis, Mr. Pascal believed that the value of $4.1 million that Husband listed on his financial statement was a

---

[3] Although Mr. Pascal did obtain some information from Husband's accountant, Husband repeatedly argued at trial that Wife's counsel or Mr. Pascal should have utilized the release to request even more information from the accountant after Husband failed to provide it. The trial judge did not buy this argument, emphasizing that Husband not only had access to the information, but the accountant testified that he provided the information directly to Husband on a monthly basis. The judge said,

And if [Husband] had sat there and said, here are all my monthly cash flows for the last three years and he hand delivered all those to Mr. Vance's office and Mr. Vance said, I'm not dealing with those, I want to just look at the 65 other stores that I looked at, I'm going to ignore that information, thank you very much [Husband], but I'm going to use this to line my bird cage, then I'd be right there with you. But he didn't do that. And that's not the testimony and that's not the proof.

In its final decree, the court found that "[Husband's accountant] provided a copy of all the monthly statements submitted to Corporate to [Husband], however [Husband] never provided a copy of any of the reports to Wife, her counsel or Mr. Rob Vance's office." The trial judge aptly observed that "this was very much a case of hiding the ball."

reasonable value for his two McDonald's franchises. We note that Husband suggested a value of only $600,000 for *both* of the restaurants combined. Even Husband admitted in his post-trial proposed findings of fact and conclusions of law that "Husband's estimate of the value of the franchises ($600,000.00) is too low," and he then proposed that the restaurants should have a combined value of $1 million. The trial judge, of course, found that Husband was not a credible witness. As previously noted, the court discussed the testimony regarding valuation at length and ultimately concluded that "[t]he most reliable evidence of the values of the two (2) McDonald's franchises comes from Husband's financial statement and Mr. Pascal's testimony validating the values in Husband's financial statement."

Although Husband criticizes the decision to rely on his financial statement from the previous year, a similar approach was used in *Powell*, 124 S.W.3d at 105, where a trial court considered not only expert testimony as to the valuation of a business but also financial statements the husband had submitted to financial institutions. On appeal, he claimed that his financial statements were inaccurate and had "overstated" the value of his business. *Id.* We explained:

> Mr. Powell now asserts that these financial statements overstated the true value of his business. Such assertions notwithstanding, "any statement, whether oral or written, made by or attributable to a party to an action, which constitutes an admission against his interest and tends to establish or disprove any material fact in the case, is competent evidence against him in such action." *Dailey v. Bateman*, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996) (quoting *Jones v. Lenoir City Car Works*, 216 Tenn. 351, 392 S.W.2d 671, 673 (1965)). Accordingly, these financial statements were properly considered by the trial court as evidence of the value of the check cashing business.
>
> "The value of a marital asset is determined by considering all relevant evidence regarding value." *Wallace*, 733 S.W.2d 102, 107 (citations omitted). If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *See Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995). In this instance, the financial statements provided by Mr. Powell are evidence which more strongly supported the valuation placed on the business by Mrs. Powell's expert, as opposed to that of Mr. Powell's expert.
>
> Accordingly, we hold that the evidence does not preponderate against the trial court's finding that Mrs. Powell's expert's testimony as to the value of Mr. Powell's interest in the check cashing enterprise, coupled with Mr. Powell's own representation as to that value, accurately reflect the true value of his interest in the business. *See* Tenn. Rule App. P. 13(d).

*Id.* at 105-106; *see also Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL

6580562, at *6-7 (Tenn. Ct. App. Nov. 10, 2020) (rejecting a husband's argument that the trial court erred in relying on his financial statement in valuing his business interests); *Grant v. Grant*, No. M2014-01835-COA-R3-CV, 2016 WL 2898434, at *7 (Tenn. Ct. App. May 12, 2016) ("The court also had additional evidence in this record, including . . . Husband's personal financial statements, that evidenced a value higher than the value found by [Husband's expert]. Resolving this type of factual dispute is uniquely the role of the trial court."); *Carpenter v. Carpenter*, No. W2007-00992-COA-R3-CV, 2008 WL 5424082, at *8 (Tenn. Ct. App. Dec. 31, 2008) ("The financial statements upon which Wife relies are competent evidence of the value of Husband's law practice.").

Given the limited financial information available in this case and the expert testimony of Mr. Pascal, we discern no reversible error in the trial court's use of a market-based approach or its consideration of Husband's financial statement. The trial court's valuation was within the range of evidence submitted at trial, and the evidence does not preponderate against it. Therefore, we affirm the trial court's valuation.

### 3.   Statutory Factor Regarding Taxes

The next issue Husband presents on appeal is "[w]hether the trial court erred when it made a division of marital assets that failed to consider the factors elucidated in Tennessee Code Annotated Section 36-4-121 appropriately." However, the argument section of Husband's brief only discusses one of the statutory factors. He argues that the trial court failed to adequately consider factor (9): "The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset." Tenn. Code Ann. § 36-4-121(c)(9). Husband claims that the trial court "failed to consider the tax consequences of selling the two McDonald['s] Franchises in order to pay Husband's alimony *in solido* obligation to Wife." His brief claims that he "would need to sell the two McDonald['s] franchises," and pay the outstanding taxes, in order to pay Wife's alimony in solido obligation. He also argues that such a sale would result in him owing "a tremendous tax obligation." Wife argues that "Husband failed to put on any proof of tax consequences for a potential future sale at trial." We agree.

In its final decree of divorce, the trial court specifically discussed each of the statutory factors and made the following finding regarding factor (9):

> There are no new known tax consequences or anticipated costs other than costs associated with the sale of the marital home in Collierville, which according to the home's value will still produce profit after those costs. There is an IRS debt incurred by Husband that may encumber some of the marital assets.

From the proof at trial, we agree with the trial court's implicit conclusion that there were

no "known" tax consequences associated with a potential sale of the McDonald's restaurants. At trial, Husband and his counsel went back and forth between representing that Husband would keep the stores indefinitely and suggesting that he was so far in debt that he was about to lose them. During opening statements, for instance, Husband's counsel proposed that the trial court fashion its alimony in futuro award in a way that would account for Wife remaining on the payroll as an employee of his McDonald's restaurants so that she could benefit from not only the pay but also the retirement benefits and health insurance going forward. He then said, however, that Husband was so far in debt that he might lose the franchises and have "nothing."

With respect to Husband's specific argument on appeal regarding tax consequences, however, Husband does not cite to any location in the voluminous record to show that he ever asked the trial court to consider the tax consequences that would result if he was forced to sell his restaurants after the divorce, or what that amount might be. Instead, his brief merely cites to the evidence in the record about the sale of his other two stores in 2014 and the tax liability that he had incurred then. We recognize that "[t]he tax effects associated with a particular asset can become relevant when the court divides the marital estate[.]" *Clark v. Clark*, No. M2006-00934-COA-R3-CV, 2007 WL 1462226, at *4 (Tenn. Ct. App. May 18, 2007). However, "the party relying on tax consequences" bears "the burden of introducing competent proof on the subject." *Id.* at *5. Husband simply failed to meet his burden on this issue. *See Clark*, 2007 WL 1462226, at *5 (noting that "the tax consequences in this case prove so speculative and unsupported in the record that Husband cannot insist upon a specific tax amount for consideration," and "[t]he trial court's order [] reflected this reality when it declined to factor capital gains taxes into the property division because there was no competent proof thereof at trial").

### 4. The Marital Estate Balance Sheet

The final issue Husband raises on appeal regarding marital property is "[w]hether the trial court erred when it failed to include information on the marital balance sheet, resulting in an inequitable division of the marital estate." He claims that certain categories of items were "mistakenly added and omitted" from the marital balance sheet, which, "when corrected, results in an inequitable division of the marital assets." We will consider each category of entries in turn.

### a. McDonald's Accounts

First, Husband argues that the trial court erred by valuing the McDonald's stores and then separately listing three entries on the marital property sheet for accounts related to the stores. Specifically, the trial court included a value of $4,099,281.72 for the "McDonald Restaurants" but then included three separate entries for "Cash MD-Operating Payroll $88,332.19," "Cash In Store $44,381.19," and "McDonald Inventories $44,321.19." Husband states in his brief that Mr. Pascal's valuation approach "does not

specifically look at the present cash value of the business's operating account, payroll accounts, or inventories." Still, he argues that the trial court "double counted" these assets related to the McDonald's stores by listing them separately.

In response, Wife points out that these entries precisely mirror the entries on Husband's own financial statement. There, Husband listed a value of $4,099,281.72 under "Investments" for "McDonald Restaurants." He then separately listed under the category of "Cash" an entry for "Cash In Store $44,381.19" and "Cash MD-Operating Payroll $88,332.19," and a separate entry of "McDonald Inventories $44,321.19" under the category of "Others." Considering Husband's own characterization of these assets, we cannot say that the evidence preponderates against the trial court's decision to list them separately, just as Husband did.

### b.     Alimony in Solido Awards and Separate Judgments

Husband's next argument is that the trial court should have included six additional entries on its marital estate balance sheet for other obligations that Husband was ordered to pay throughout the divorce proceeding. Specifically, he lists the alimony in solido awards for Wife's attorney fees and accountant fees, a judgment for unpaid alimony pendente lite, the trial court's previous award of attorney fees in connection with pendente lite support, the judgment from the consent order on Wife's second contempt petition, and the judgment related to Wife's third contempt petition. He summarily argues that all of these awards "represent liabilities to Husband and assets to Wife of marital property," and therefore, they should have been included on the marital balance sheet and considered within the percentages of marital property awarded to each party. However, Husband does not cite any authority in support of his argument that any of these various types of obligations should have been included within the percentages regarding marital property division. As a result, we conclude that this issue is waived. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010); *see also Lunsford v. K-VA-T Food Stores, Inc.*, No. E2019-01272-COA-R3-CV, 2020 WL 1527002, at *6 (Tenn. Ct. App. Mar. 31, 2020) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.'").

### c.     Additional Businesses

Finally, Husband appears to also challenge the trial court's conclusions regarding his additional businesses. The trial court's balance sheet listed the following additional assets as being awarded to Husband: Byrd Brothers, LLC; Byrd Affiliates, LLC; Byrd &

Byrd, LLC; Byrd, Byrd & Byrd, LLC; Ox Theory, LLC; Byrd Group, Inc.; Byrd Development Group, Inc.; Byrd Development Arlington, LLC; Byrd and Associates, LLC; Byrd Parity One; Ebony & Ivory, LLC; Byrd Development, LLC; Byrd Management Group; Byrd MGM; Byrdcorp, Inc.; J & B Management; Diamond Enterprises; and Cottonwood Office Park. The trial court listed each of these businesses with a value "Unknown." However, the trial court found it appropriate to award Wife a greater percentage of the marital estate in light of all of the relevant statutory factors "and the many unknown values on additional assets Husband is receiving." Husband argues on appeal that it was "illogical" for the court to assign them an unknown value but at the same time to treat them as "potentially having value."

Again, Husband is complaining about a problem that he created. "The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present." *Wallace*, 733 S.W.2d at 107. Husband cannot complain about the trial court's failure to assign a specific value to his additional business entities when he failed to introduce any evidence of their values himself. *See Kholghi v. Aliabadi*, No. M2019-01793-COA-R3-CV, 2020 WL 5607816, at *20-21 (Tenn. Ct. App. Sept. 18, 2020) (concluding that a husband could not complain on appeal about the trial court's consideration of the fact that the wife owned an interest in property in Iran with an unknown value when the husband failed to propose any value for the asset at trial); *Gant v. Gant*, No. M2015-02160-COA-R3-CV, 2017 WL 417225, at *9 n.8 (Tenn. Ct. App. Jan. 31, 2017) ("In this case, the parties failed to provide evidence of the value of this property; therefore, we find no fault with the trial court not placing a value on the property.").

### D. *Judgments to Non-Parties*

The next issue Husband presents on appeal is "[w]hether the trial court erred when it awarded judgments to persons not a party to the action." This issue relates to the trial court's awards of attorney fees and accountant fees as alimony in solido and related judgments awarded directly to her attorneys and Mr. Vance's firm. The section of Husband's brief addressing this issue consists of only a few sentences. Aside from quoting a definition of the word "judgment," he summarily states, with no further citation to authority: "A trial court is empowered to award judgments only to a party who has filed a claim for relief pursuant to Tennessee Rule of Civil Procedure 8.01. It is an error of law for the trial court to award a judgment to a non-party." Husband's brief comes dangerously close to waiving this issue, but we have nevertheless decided to address it.

In *Wilson v. Wilson*, 987 S.W.2d 555, 566 (Tenn. Ct. App. 1998), a wife challenged an attorney fee award on two fronts: the merits of the award, and "the form of the award." We found that the award of attorney fees was warranted on its merits. *Id.* However, regarding "the form of the award," the wife challenged "the fact that the final decree award[ed] [the husband's] attorney a judgment against [the wife]." *Id.* On this issue, we concluded that the wife was correct. *Id.* We explained, "The attorney is not a party to this

action, so any award should run to [the husband] and not his attorney. The lower court's judgment should be modified to that extent." *Id.* In particular, we modified the decision "to make the judgment for attorney's fees run to [the husband] instead of his lawyer." *Id.* at 556-57. In a later case, this Court cited *Wilson* for the notion that "attorney's fees awards should not be granted directly to a spouse's attorney insofar as the attorney is not a party to the divorce action." *Kennedy v. Robson*, No. 01A01-9707-CV-00343, 1998 WL 754990, at *2 (Tenn. Ct. App. Oct. 30, 1998).

Here, Husband does not present any argument regarding the merits of the awards. His brief states, "A trial court possesses the power to award costs and fees as *in solido* alimony. However, the trial court does not possess authority to award judgments to persons or entitles who are not parties to the action and have not made any claim for relief." Thus, following the reasoning of *Wilson*, we modify the trial court's award to make the judgment for attorney fees and accountant fees run to Wife only, rather than her attorneys or Mr. Vance's firm.

### E. Criminal Contempt

The final issue raised by Husband on appeal is "[w]hether [the] trial Court err[ed] by finding Husband guilty of criminal contempt without articulating whether such finding was beyond a reasonable doubt and contrary to the evidence submitted at trial."[4] We begin with his argument regarding the evidence against him. The following standards apply when reviewing a finding of criminal contempt:

> A person charged with criminal contempt is presumed innocent, and guilt must be proven beyond a reasonable doubt. *Black v. Blount*, 938 S.W.2d 394, 399 (Tenn. 1996); *Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 377 S.W.2d 908, 912 (1964). Once convicted, however, the contemnor loses the presumption of innocence and bears the burden of overcoming the presumption of guilt on appeal. *Black*, 938 S.W.2d at 399; *Robinson*, 377 S.W.2d at 912. Thus, appellate courts do not review the evidence in a light favorable to the accused. *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). A conviction will be reversed for insufficient evidence only when the facts in the record, and any inferences that may be drawn therefrom, are insufficient as a matter of law for a rational trier of fact to find the accused guilty of the crime beyond a reasonable doubt. *Black*, 938 S.W.2d at 399; Tenn. R. App. P. 13(e).

---

[4] We note that Husband raises no issue on appeal regarding the sanction for contempt, so we will not address it. *See, e.g.*, *Richardson v. Richardson*, No. M2020-00179-COA-R3-CV, 2021 WL 4240831, at *15 n.6 (Tenn. Ct. App. Sept. 17, 2021) ("Mother does not specifically take issue with the length of the sentence in either of her briefs. As such, we will not address it.")

*State v. Beeler*, 387 S.W.3d 511, 519 (Tenn. 2012).

Here, in the final decree, the trial court described the mandatory mutual injunction and all of the subsequent orders entered over the course of the proceeding that prohibited Husband from destroying or deleting files from any device. The trial court then noted Wife's allegation that Husband violated those orders by "destroying or allowing the destruction of" 175,000 files from his laptop. The trial court described the testimony of Mr. Scott, the certified computer examiner who examined Husband's laptop. It noted his testimony that the CCleaner tool was used to permanently erase the files, that the user "intentionally elected" permanent erasure of the documents, and that it was installed only days before the deletion took place and after the court orders had been entered prohibiting Husband or anyone on his behalf from deleting files. The court noted that all of Mr. Scott's opinions were to a reasonable degree of computer forensic certainty. The trial court also described the testimony of Mr. Carter that he routinely cleaned the laptop with CCleaner, but it found his testimony "conflicts with the fact that the C[]Cleaner was downloaded to the Husband's laptop on August 9th and that 175,000 documents were deleted days later." The trial court also acknowledged Husband's testimony that he did not request that anyone delete certain files from the laptop. However, the court found that Husband did not inform Mr. Carter about the orders not to delete information from computers, as Mr. Carter said he was unaware of the orders. The trial court found that "Husband was very aware of the injunctions and the ongoing search for information." The court concluded that Mr. Carter was not a credible witness based on the intentional deletion of the files, Husband's knowledge that the information was being actively sought by Wife's attorney, and Husband's pattern of behavior in that timeframe. The trial court cited the statutory authority for a criminal contempt finding and the four elements necessary for a finding of contempt. Even though Husband denied that "he personally violated the order," the court found that, "at a minimum, Husband allowed an individual to delete information from his laptop in violation of court orders" and "took no steps to stop the deletion" after multiple orders were entered. Additionally, however, the court found that "Husband's credibility has been so soiled through his actions in this litigation and repeated misstatements under oath that this Court has little faith in Husband's version of how this violation occurred." It noted that findings of willfulness are uniquely factual and within the province of the trier of fact, who is able to view the witnesses and assess their credibility. Considering all the circumstances, the court concluded that Husband's violation of the order was willful, intentional, "and done with a culpable state of mind."

On appeal, Husband emphasizes his own trial testimony denying that he took action to have the files deleted. However, the trial judge found Husband was not credible and concluded that this was "a willful violation" of the court's orders. Husband also points out that Phillip Carter admitted that *he* deleted the files, and he claims that Mr. Scott "could not testify that Husband committed any act." As the trial court noted, however, multiple injunctions prohibited Husband and anyone acting on his behalf from deleting files. In the midst of the ongoing dispute over Husband's cell phone, iPad, and computers, the

- 41 -

injunction signed on August 13, 2018, specifically stated that Husband and his agents were prohibited from destroying, deleting, or erasing any files or documents. Yet, it is undisputed that Husband did not inform Mr. Carter about this or any other order. That very night, Husband either directed or, "at a minimum . . . allowed," Mr. Carter to permanently erase 175,000 files from his laptop, with the process of deletion beginning shortly before midnight on August 13 and concluding in the early morning hours of August 14. Despite Husband's arguments regarding the evidence, he has failed to overcome the presumption of guilt on appeal.

The final argument made by Husband is that the trial court's finding of criminal contempt must be reversed because the order did not state that the finding was made "beyond a reasonable doubt." He suggests that the trial court either neglected to make a finding beyond a reasonable doubt or used an inappropriate standard by referencing the fact that "Mr. Scott's opinions" were to a reasonable degree of computer forensic certainty. We disagree.

This argument is analogous to one presented to the Court of Criminal Appeals in *State v. Cooper*, No. E2012-01023-CCA-R3-CD, 2013 WL 3833412 (Tenn. Crim. App. July 22, 2013) *perm. app. denied* (Tenn. Nov. 14, 2013). In that case, a "career offender" statute provided that "'[a] defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the maximum sentence within the applicable Range III.'" *Id.* at \*2 (quoting Tenn. Code Ann. § 40-35-108 (2010 Repl.)). On appeal, the Court considered whether the defendant was "entitled to relief on the basis that the trial court did not state on the record that it had 'found beyond a reasonable doubt' that Defendant was a 'career offender.'" *Id.* at \*4. The Court concluded that he was not:

> Defendant has cited no case law or statute that requires the trial court to specifically verbalize that it found him to be, beyond a reasonable doubt, a "career offender." Defendant similarly cites to nothing in the record which would imply that the trial court used a less stringent standard in finding Defendant to be a "career offender." The statute is clear about the trial court's necessity to make its finding beyond a reasonable doubt. In this case, we presume that the trial court followed the statute in light of the proof presented and we will not infer from this record that the trial court used a lesser standard of proof than "beyond a reasonable doubt."

*Id.*

Additionally, this Court has considered a similar argument in the particular context of a criminal contempt finding. In *Coffey v. Coffey*, No. E2012-00143-COA-R3-CV, 2013 WL 1279410, at \*9 (Tenn. Ct. App. Mar. 28, 2013), we explained:

> Husband next argues that the trial court erred in finding him in

criminal contempt without requiring proof beyond a reasonable doubt. Husband's argument is based upon the language in the court's order reciting that there is "clear and convincing evidence" that Husband was able to pay the obligation but willfully refused to do it. Husband is correct that persons charged with criminal contempt are presumed innocent and should not be found guilty absent proof of guilt beyond a reasonable doubt. *Storey v. Storey*, 835 S.W.2d 593, 599 (Tenn. Ct. App. 1992). Husband seems to assume that since the court used the incorrect terminology, the proof is insufficient as a matter of law. He does not cite us to any authority for the proposition that the trial court's mention of a lesser burden of proof precludes a finding on review that the record shows proof of guilt beyond a reasonable doubt. In fact, Husband does not even argue that should be the law. In our independent research we have found no such authority. Accordingly, we think it proper to follow the path we charted in *Fortson v. Fortson*, No. 03A01-9611-CV-00363, 1997 WL 529001 at *4-5 (Tenn. Ct. App. E.S., filed Aug. 28, 1997), of reviewing the record to see if it contains proof of guilt beyond a reasonable doubt.

*Id.*

Here, we do not interpret the trial court's order as applying an *incorrect* standard simply by its reference to the standard Mr. Scott mentioned during his testimony. However, to the extent that the court neglected to include a specific statement that its finding was made beyond a reasonable doubt, we will presume that the trial court applied the correct standard, as in *State v. Cooper*, 2013 WL 3833412, at *4. Even if we followed the approach used in *Coffey*, however, the record contains proof of guilt beyond a reasonable doubt. In either event, the trial court's failure to specify that its finding was made "beyond a reasonable doubt" does not entitle Husband to relief on appeal.

### F. Attorney Fees

The only issue raised by Wife is whether she should be awarded her attorney fees on appeal pursuant to Tennessee Code Annotated section 36-5-103(c).[5] This request is respectfully denied.

### IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court as modified and remand for further proceedings. Costs of this appeal are taxed to the

---

[5] We note that Wife's brief contains typographical errors in which she incorrectly requests that her fees be awarded under Tennessee Code Annotated section 36-6-103(c). However, we have considered her claim for fees pursuant to Tennessee Code Annotated section 36-5-103(c).

appellant, James Franklin Byrd, for which execution may issue if necessary.

_____
CARMA DENNIS MᴄGEE, JUDGE